UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| UNITED STATES ) | Case No: 1:16 CR 10167-2 NMG |
| ) | |
| v. ) | |
| ) | |
| JAMES WARNER ) | |

**DEFENDANT JAMES WARNER'S
OMNIBUS OBJECTIONS TO PSR AND SENTENCING MEMORANDUM**

The Defendant in the above-captioned matter, James Warner, respectfully submits this Sentencing Memorandum for the Court's consideration. For the reasons set forth below, the defendant proposes a sentence of "time served" or approximately 16 months,[1] followed by three (3) years of supervised release. He proposes the following conditions be imposed during his time on supervised release: (1) that he remain drug free; (2) participate in either the Re-Start or CARE program; (3) submit to random urine screens; (4) attend 3 AA/NA meetings per week; (5) seek employment; (6) if and when employed, contribute to child support for any biological children as required by law; and (7) commit no abuse towards any person. The defendant asserts that this sentence is "sufficient but not greater than necessary" to achieve the purposes of sentencing set forth in 18 U.S.C. § 3553(a). United States v. Kimbrough, 128 S.Ct. 558 (2007); United States v. Booker 125 S.Ct. 738 (2005).

---

[1] At the time of sentencing, the defendant will have served just over sixteen (16) months.

1

## STATEMENT OF THE FACTS

## DEFENDANT'S BACKGROUND

Mr. Warner is 30 years old and is lifetime resident of greater Boston. His parents are both still alive and married to each other.

He has an 11th grade education and has also completed the "strive" program out of Dorchester for job assessment and placement. At the time of his arrest, he was taking classes for Microsoft Word and Excel. His next step was a GED.

Mr. Warner's brother owns a successful plumbing business, and Mr. Warner has worked for him. He has a job waiting upon release from incarceration.

He has two children with his long-time girlfriend, Annie Webb. He tries to spend as much time with them as possible. One is autistic and requires substantial extra attention. He has been in a relationship Annie Webb for over eight years.[2] Mr. Warner has three (3) brothers and one (1) sister. [3]

An older brother passed away at age 14 in 1996. It was difficult for Mr. Warner to lose a brother that young whom he looked up to and respected. Mr. Warner grew up in a low-income neighborhood in Roxbury which was plagued with drugs and violent crime. One of Mr. Warner's brothers was convicted at the age of seventeen (17) for a crime he did not commit and was incarcerated for thirteen (13) years. Mr. Warner's mother is a deeply religious Christian woman. His father worked two (2) jobs to support his family.

Defendant is NOT and has never been a "gang member." He is a hard working man with limited education, trying to support a family.

---

[2] The PSR discuss a restraining order Ms. Webb obtained in 2014. We have had substantial interaction with Ms. Webb in our office and believe she sincerely supports Mr. Warner and that there is no pattern of abuse.

[3] Including half siblings, we believe he may have as many as nine (9). The PSR states that there are a total of five (5) (PSR para. 57)

2

He accepts responsibility for his crime and sees this case as catalyst for better future.

## THE OFFENSE

Defendant sold an old firearm to an undercover informant. He accepted responsibility for a single count of 18 U.S.C 922(g)(1). He may have had a triable case because the alleged informant has next to no credibility.[4] However, segments of the event were recorded on videotape, and defendant felt it best to accept responsibility for his singular error in judgment.

The Presentence Report ("PSR") piles on unproven allegation after unproven allegation. There is a suggestion that the defendant is a gang member. There is an assertion that USSG § 2k2.1(b)(6)(B) is applicable.

Apart perhaps from the informant's babble, there is no evidence of these allegations.

## GUIDELINE CALCULATION

**Probation Department Calculation**

In its Presentence Report, the Probation Office determined that the Base Level for the Offense was 14. Four (4) were added for trafficking (4) (2k2.1 (b)(5). Four (4) more were added for an allegation that the defendant knew the firearm would be used in a felony. USSG 2k1.2.1(b)(6)

With an adjustment for acceptance of responsibility, this brought the total offense level to 19.

Probation then determined the Criminal History Category III.

This resulted in a proposed sentence of 37-46 months.

---

[4] On information and belief, co-defendants and other persons arrested as a result of the alleged cooperating witness, CW-1, have mounted substantial challenges to the informants credibility, forcing the government to concede that the informant has issues. CW-1 made threatening statements on a social networking site to Annie Webb. Upon learning of the threatening behavior, undersigned contacted AUSA Crowley, who immediately took steps to address the matter. We are not here mounting such an intense challenge as co-counsel. The goal here is simply to ensure that the defendant is only sentenced for events that can be proven.

**Defendant's Calculation**

    A.       **The PSR Errs in Paragraph 22.**

Defendant disputes the assertion that USSG §2k2.1(b)(6)(B) is applicable.  Under USSG 2k2.1(b)(6)(B), a defendant may receive a 4-point enhancement if he "used or possessed any firearm or ammunition in connection with another felony offense; or possessed or transferred any firearm or ammunition with knowledge, intent, or reason to believe that it would be used or possessed in connection with another felony offense..."

The PSR suggests that the defendant should receive a 4-point enhancement pursuant § 2k2.1(b)(6)(B).  Psr, P. 8, Para. 23.  Nothing in the paragraph points to any specific facts that would justify this enhancement.

Reference to the earlier paragraphs submitted under the heading "offense conduct" describe hearsay statements from the alleged informant referencing a "gang war." PSR, p. 9 para. 5.  This nonsense cannot provide the basis for the proposed enhancement.

There is no evidence that Mr. Warner knew anything about the buyer and therefore could not possibly have intended a felony to have been committed.  More significantly, the great majority of gun buyers obtain weapons because they believe they need protection from aggressors.[5]

Generally speaking, an individual may only be deemed responsible for "foreseeable conduct within the scope of his own explicit or implicit agreement." *U.S. v Laboy*, 351 F. 3rd 578, 583 (1st. Cir. 2003) (citing, *United States v. Carrozza*, 4 F.3d 70, 76 (1st Cir.1993)).  The PSR essentially seeks an expansion of USSG para. 2k2.1(b)(6)(B) to the point where it amounts to guilt by association.  There is an unproven allegation that Warner was involved in

---

[5]    The court can take judicial notice that the number of privately held firearms in the U.S. far outnumbers the number of firearm related felonies.

gang activity. This is simply not enough.

The government has no evidence that Warner had any reason to believe the firearm he sold CW-1 would be used or possessed in connection with a subsequent felony at the time of the sale. First, the government fails to identify *any* such felony for which Mr. Warner is alleged to have reason to believe would be committed with the firearm. The buyer of the firearm, CW-1, was a cooperating witness purchasing the firearm at the direction of federal agents. Indeed, there is no evidence in the record as to the buyer's intention. As stated, it was far more likely that the purchaser wished to have a weapon for personal protection.

In *U.S. v. Leahy*, 668 F. 3d 18 (1st. Cir. 2012) the court held that:

> Where, as here, a defendant is convicted of unlawful possession of a firearm, the application of this guideline depends on whether the defendant possessed the firearm "in connection with" another felony offense and whether the additional offense is one qualifying for the enhancement. *See United States v. Paneto,* 661 F.3d 709, 715 (1st Cir.2011).

Similarly, in *U.S. v. Matthews*, 749 F. 3d 99 (1st. Cir. 2012) the court took a holistic view upon far more egregious misconduct.

> Taking the evidence in its totality (a macro approach, not a piece-by-piece micro one), we see enough here to support the district court's finding that Matthews committed "another felony"—namely, felony drug trafficking.
>
> *See Cannon,* 589 F.3d at 519 (indicating that felony drug trafficking is a qualifying felony under § **2K2**.**1**(**b**)(**6**)(**B**)). Matthews already had a felony drug-trafficking conviction under his belt before getting busted in our case. Also, after moving from New York to Maine, he chose at some point to pal around with another drug trafficker, McFadden, living with him for a time and getting pulled over with him in a traffic stop. More, Matthews sold Weeks crack in the past—the very drug she was "supposed to" get for helping the gun buy go down. More still, despite having no job, he had thousands of dollars in cash on him when stopped by law enforcement. On top of that, he had gotten Weeks to buy the pistol for him and had 3.2 grams of marijuana on him, with the gun inches from him when nabbed…

5

Mathews, supra, 749 F. 3rd at 105-106.

By contrast, here the evidence is simply of a sale that others arranged. One cannot assume that every sale of a firearm infers a subsequent felony; even if the buyer is not of the highest character.

In a recent case, *United States v. Taylor*, 485 F.3d 458 (1st.Cir. 2017), the First Circuit addressed the knowledge requirement of a similar enhancement provision to the one here in issue.[6] In *Taylor,* the Court upheld the 4-point enhancement because "'the cooperating witness [said] that he [was] going to take the serial number off" and that therefore 'Mr. Taylor as a supplier would know [that the transfer] involved some unlawful possession or the use or disposal of the firearm unlawfully.'" *Id*. at 460.

The present matter is readily distinguishable. There is nothing contained within the government's PSR which demonstrates that Mr. Warner knew anything at all apart from his quick participation in a hastily arranged sale.

If the government presses this point, Warner respectfully requests the right to an evidentiary hearing on this point.

### DEPARTURES AND OTHER CONSIDERATIONS

### CHARACTERIZATION AS A CATEGORY III OFFENDER OVER-REPRESENTS THE SERIOUSNESS OF HIS PAST OFFENSES

The PSR asserts that the defendant's criminal history is a category III. We do not quarrel with the technical accuracy of this assertion.

Careful analysis suggests that a current assessment of category III is unjust and unfair.

---

[6] Under §2K2.1(b)(5), a defendant may receive a 4-point enhancement if he "knew or had reason to believe that such conduct would result in the transport, transfer, or disposal of a firearm to an individual...whose possession or receipt of the firearm would be unlawful"

There are a total of eleven alleged "convictions" mentioned. [7] They involve the most minor charges, such as "disorderly conduct."  See e.g. PSR, p., 14.  Almost all the others, including the most recent, were minor drug possession charges.  For example, on January 16, 2007, the defendant was charged with "possession of class D," and the case was continued without a finding.  He was jailed for ninety days after he failed a drug test.

      Indeed, careful review suggests that, for the most part, defendant's criminal days were far behind him.  Growing up poor, black, and in a rough neighborhood, the defendant naturally has had unpleasant police interactions.  None are significant.

      Therefore, the defendant suggests that it would be appropriate to depart downward. §4A1.3(b) authorizes a downward departure where "the defendant's criminal history category substantially over-represents the seriousness of the defendant's criminal history."  See also United States v. Woodley, 344 F.Supp.2d 277 (D. Mass. 2004).  See, United States v. Gaskill, 991 F.2d 82, 86 (3rd Cir.1993) ("It is important, too, to realize that departures are an important part of the sentencing process because they offer the opportunity to ameliorate, at least in some aspects, the rigidity of the Guidelines themselves.  District judges, therefore, need not shrink from utilizing departures when the opportunity presents itself and when circumstances require such action to bring about a fair and reasonable sentence.").

      To categorize the defendant as a Category III places him in a very high category.  This does not reflect the purposes of the sentencing commission in implementing the guidelines nor does it reflect the purposes of sentencing outlined in § 3553(a).  By no means does the defendant downplay or fail to comprehend the seriousness of his record.  However, under the guidelines,

---

[7]     The PSR also discusses eight (8) additional arrests.  One must wonder whether Mr. Warner's real problem is that he is black, parties too hard, lives in a poor part of town, and talks back to police. For example, on page 13 (para. 40) he was charged with selling alcohol to a minor. The add-on was "threats to commit a crime…" meaning, Warner talked back when arrested for next to nothing.

7

the criminal history computation was intended to predict recidivism.  Exhibit A, p. 13.  In practice, one's criminal history computation has proven to be an unreliable predictor.  Id.

This defendant does not resemble the defendants for whom the Sentencing Commission intended to include in category III.

## II.   PURSUANT TO THE §3553(a) FACTORS "TIME SERVED" IS FUNDAMENTALLY FAIR

The Supreme Court's decision in United States v. Booker, 125 S.Ct. 738 (2005), rendered the Sentencing Guidelines advisory rather than mandatory.  In Gall v. United States, 128 S.Ct., 586 (2007), the Court clarified further that the sentencing court "may not presume that the Guidelines range is reasonable."  128 S.Ct. 586, 596.  United States v. Kimbrough, 128 S.Ct. 558 (2007) took sentencing a step further and emphasized the importance of individualized case-by-case sentencing determinations.  This line of cases requires the district court to impose a sentence minimally 'sufficient, but not greater than necessary', to comply with the purposes set forth in 18 U.S.C. §3553(a).  See United States v. Kimbrough, 128 S.Ct. 558 (2007); Gall v. United States, 128 S.Ct. 586 (2007); United States v. Booker 125 S.Ct. 738 (2005).   This "organic reading of section 3553(a) suggests that a sentencing judge should engage in a holistic inquiry", by considering "a tapestry of factors, through which runs the thread of [the] overarching principle of parsimony."  United States v. Rodriquez, 527 F.3d 221, 228 (1st Cir.2008).

### A.   The Need to Avoid Unwarranted Sentence Disparities Among Defendants with Similar Records Who Have Been Found Guilty of Similar Conduct

In cases such as this, the government's charging authority unfairly discriminates against the defendant because it allows the government's sole charging authority to determine (1) whether the defendant would be charged in State or Federal court; and (2) whether the defendant

would be eligible for a downward adjustment based on role, amounting to a large discrepancy in individual sentences.

### 1.     State v. Federal

The government's choice of venue, state or federal, often results in a huge discrepancy in sentencing.  In Massachusetts, this case would never have been removed from the state District Court, which has limited jurisdiction and sentencing options.  At the very most, the defendant would serve 2 ½ years; but it is more likely that he would serve much less.  This is a far cry from the PSR recommendation.

Perhaps equally significant, the defendant has already been incarcerated long enough to learn the hard lesson that the Federal government means business.  Essentially, he is a tiny player caught in the web of a larger federal investigation.

### 2.     § 3553 (a)(6) Counsels To Avoid Unwarranted Disparities

§ 3553(a)(6) requires a court to consider sentences for similarly situated defendants in order to avoid unwarranted sentencing disparity which would undermine the legitimacy of and trust for the judicial process.

These sentences mitigate in favor of the defendant's request that he be sentenced to time served followed by three years supervised release.  The defendant has already been in custody for 16 months.  Considering the other sentences and the other factors discussed infra, this sentence is fair and just.

### B.     The Requested Sentence Promotes Respect for the Law and Properly Fulfills the Purposes of Sentencing

18 U.S.C. §3553(a)(2) address the traditional purposes of sentencing: punishment, specific and general deterrence, and rehabilitation.  Considerable attention has been given infra to the appropriateness of the proposed sentence as proper punishment of this defendant.

Rehabilitation needs of this defendant are addressed by the proposal that he participate in the Re-Start or CARE programs, which is discussed more fully under the section focused on the specific characteristics of the defendant. Therefore, the need for the sentence to address issues of deterrence and, more generally, public respect for the law is discussed here.

The sentence requested by the defendant emphasizes the seriousness of the offense while simultaneously promoting the community view that justice can provide opportunities in addition to punishment.

"Research to date generally indicates that increases in the certainty of punishment, as opposed to the severity of punishment, are more likely to produce deterrent benefits." Exhibit A, page 1. Additionally,

> A 1999 study…in a meta-analysis reviewing 50 studies dating back to 1958 involving a total of 336,052 offenders…[c]ontrolling for risk factors such as criminal history and substance abuse, the authors assessed the relationship between length of time in prison and recidivism, and found that longer prison sentences were associated with a three percent increase in recidivism. Offenders who spent an average of 30 months in prison had a recidivism rate of 29%, compared to 26% rate among prisoners serving an average sentence of 12.9 months…being incarcerated versus remaining in the community was associated with a seven percent increase in recidivism."
> Id. p. 6-7.

The requested sentence proposes a shorter incarcerated time coupled with extensive supervised release versus a lengthy period of incarceration. The proposed sentence stays in line with studies and research demonstrated that deterrence does not require lengthy prison time but rather a good reentry program.

> High levels of incarceration damages communities.
>
> We justify prison in part because it is expected to ameliorate the problems faced by those who live in high-crime communities. Yet cycling a large number of young men from a particular place through imprisonment, and then returning them to that place, is not healthy for people who live in that place. There are sound theoretical reasons to expect high incarceration rates to make many of these

10

places worse, not better.

*Imprisoning Communities: How Mass Incarceration Makes Disadvantaged Neighborhoods Worse*, Todd R. Clear, 2007, page 93.

Mr. Warner may no longer be a 'young' man, but he is a man with a family and young children. Mr. Warner had become a very active and involved father prior to his incarceration in this matter.

The sentence proposed here focuses on breaking the cycle of recidivism by providing Mr. Warner with a plan and opportunity for success. This is what promotes respect in the community for the law and strengthens the public's perception of the legitimacy of the system.

### C. The Nature and Circumstances of the Offense and the History and Characteristics of the Defendant

§ 3553 (a)(1) requires that the nature and circumstances of the offense along with the specific characteristics of the individual defendant should be considered in sentencing. The defendant is 31 years old. Studies published within the last decade have shown what many intuitively knew, criminal activity and age are linked. This connection was acknowledged in Miller v. Alabama, 567 U.S. 460, 132 S.Ct. 2455 (2012).

Here, the defendant has reached the point in life that studies show he is considerably less likely to reoffend

### D. The Court is Not Limited to any Particular Kinds of Sentences

§ 3553 (a)(3) allows the Court consider "the kinds of sentences available." Here, the Court is not constrained in its ability to choose an appropriate sentence.

### E. The Defendant's Need for Educational or Vocational Training, Drug Addiction Treatment, and Mental Health Treatment

As most psychologists, sociologists and criminologists would agree, the likelihood of recidivism decreases when a person's addictions and mental health issues are treated and under

control, even through court order.  See Exhibit B, 237-259.  "We cannot break the cycle of recidivism without increased attention to prevention and treatment, as well as comprehensive prisoner reentry programs."  Ass't Attorney General Lanny Breuer, statement to Subcommittee on Crime and Drugs, April 29, 2009.

Mr. Warner was addressing his parenting skills through work with the Department of Families and Children prior to his incarceration.  Mr. Warner has been addressing his substance abuse problems during his incarceration.  He has also been taking classes to complete his GED.  Mr. Warner has done as much as he can on his own to address these issues.  Under the supervision of the Court in the Re-Entry or CARE program, Mr. Warner can continue to move forward in his commitment to improve his life and be there for his children.  The ability to work, care for his aging parents, and be a father to his children is critical for his continued success.

### F.    A Departure Is Warranted Because The Offense Level Has Been Unduly Magnified

A downward departure is justified under § 3553 because the "offense level has been extraordinarily magnified by a circumstance that bears little relation to the defendant's role in the offense".  United States v. Restrepo, 936 F.2d 661, 667 (2d Cir. 1991).  This departure would be warranted regardless of whether the defendant qualified for a departure under § 3B1.2.  See United States v. Stuart, 22 F.3d 76, 83-84 (3d Cir. 1994) (court may depart where offense level overstates culpability due to external circumstances, even where defendant's conduct renders him ineligible for §3B1.2 adjustment).

The defendant's offense level is significantly upwardly skewed when one adds the alleged 4 points for USSG Para. 2k2.1(b)(6)(B).[8]  This status bears no relationship to the facts of

---

[8]    This argument assumes that the court does not accept our earlier argument that the applicability of USSG Para. 2k2.1(b)(6)(B) has simply never been proven. It is presented as an alternative.

this case, a petty sale; nor does it bear any real relationship to the defendant's criminal history. They involve the most minor charges, such as "disorderly conduct." See e.g. PSR, p., 14. Almost all the others, including the most recent, were minor drug possession charges.

### A SENTENCE OF TIME SERVED FOLLOWED BY 3 YEARS SUPERVISED RELEASE IS SUFFICIENT, BUT NOT GREATER THAN NECESSARY

The defendant asserts that this is an appropriate sentence because, in addition to all the reasons stated supra, the proposed sentence reduces the likelihood that Mr. Warner will reoffend. Mr. Warner wants to be a dad. He knows he has made a serious mistake, but he has already paid a very high price.

"Offenders are more likely to recidivate (25.6%) when their sentence is a straight prison sentence." Exhibit A, page 13. "Recidivism is comparatively low for the lowest sentences (less than six months, or probation), peaks with mid-length sentences (lengths of roughly six months to two years) and then drops for the longest sentences. Id at 14. See also Exhibit B, page 7 ("recidivism rates did not vary substantially whether prisoners were released anywhere in the range of six months to five years."). This is because "when prison sentences are relatively short, offenders are more likely to maintain their ties to family, employers, and their community, all of which promote successful reentry into society. Conversely, when prisoners serve longer sentences they are more likely to become institutionalized, lose pro-social contacts in the community, and become removed from legitimate opportunities, all of which promote recidivism." Id. at 7.

According to the Bureau of Justice statistics from 2006, probation and "parole" result in only a 7% rate of return to incarceration for a federal offender on probation or parole. See www.ojp.usdoj.gov/bjs/pub/pdf/ppus06.pdf table 5. Furthermore, probation supervision during

supervised release is also a more cost effective alternative to longer BOP incarceration.  See

www.nyfederalcriminalpractice.com/2008/05/government-estimates-costs-of.html

## **CONCLUSION**

Based on the factors detailed above, the defendant requests that the Court sentence Mr. Warner to time served followed by 3 years supervised release.

The defendant further requests that no fine be imposed because he has no reasonable ability to pay such a fine.  Any funds he may earn in the future are best utilized for care of his children.

Defendant suggests that such a sentence is reasonable and sufficient but not greater than necessary.

                              RESPECTFULLY SUBMITTED
                              By his attorney:

                               */s/ Robert S. Sinsheimer*
                              Robert S. Sinsheimer, BBO No.464940
                              SINSHEIMER & ASSOCIATES
                              92 State Street, 9th Floor
                              Boston, MA 02109
                              617-722-9954

Dated:  September 1, 2017

### CERTIFICATE OF SERVICE

I hereby certify that I served a true copy of this document by electronic filing, on September 1, 2017, to all parties that participate in the ECF system and by first class mail to all parties not listed on the ECF system.

                               */s/ Robert S. Sinsheimer*
                              Robert S. Sinsheimer, BBO No.464940